IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.   CRIMINAL NO 3:08CR014

ROBERT L. MOULTRIE,
NIXON E. CAWOOD, CHARLES K.
MOREHEAD, FACILITY HOLDING CORP.,
d/b/a/ THE FACILITY GROUP, FACILITY
MANAGEMENT GROUP, INC., FACILITY
CONSTRUCTION MANAGEMENT, INC. and
FACILITY DESIGN GROUP, INC.

**ORDER**

On defendant Robert Moultrie's motion, this court held a *Daubert* hearing on May 1 and 2 to determine the state of the science of polygraphy and the admissibility of the results of two polygraph examinations taken by Moultrie. After hearing evidence and argument of counsel, this court is prepared to rule.

Defendant Robert Moultrie and others were charged in a sixteen count indictment related to the construction and operation of a state governmental venture commonly known as the Mississippi Beef Project. The defendants are alleged to have engaged in various acts of illegal conduct ranging from theft or bribery concerning programs receiving federal funds to mail fraud. When Moultrie was informed that he was the subject of an investigation, he submitted to a privately administered polygraph examination on December 18, 2006. The questions asked during the polygraph examination were formulated by Moultrie's attorney and the polygrapher. After the examination, counsel for Moultrie offered to furnish the results of this examination to

1

the government, provided that the government understood that he did not intend to waive attorney-client privilege or work product privilege. The government declined to review the examination under the conditions stipulated by the defendant.

Moultrie submitted to a second privately administered examination on December 8, 2007. As in the first examination, the questions were formulated by Moultrie's attorney and the polygrapher. These results were offered to the government through a letter dated December 10, 2007. The government reviewed this examination and determined that it could not accept results of this examination as valid. The parties engaged in further discussions and arranged for Moultrie to take an FBI administered polygraph examination under standard conditions on February 5, 2008. This examination was cancelled and was never rescheduled due to continued disagreement between the parties over terms and circumstances of the examination. Moultrie now seeks to have the results of the two privately administered polygraph examinations deemed admissible for presentation to a jury.

## ANALYSIS

In *U.S. v. Posado*, the Fifth Circuit overturned the *per se* inadmissibility of polygraph evidence. 57 F.3d 428 (5th Cir. 1995). In making this determination, the Fifth Circuit reviewed the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) analysis of Fed. R. Evid. 702, which governs the admissibility of expert testimony. The *Posado* panel stated that Rule 702 requires that the "trial judge make initial determinations under Rule 104(a) that the proferred evidence possesses sufficient evidentiary reliability to be admissible as scientific, technical, or other specialized knowledge and that the proffered evidence is relevant in the sense that it will assist the trier of fact to understand the evidence or to determine a fact in issue." 57 F.3d at 432.

2

(internal quotations omitted). Whether evidence assists the trier of fact is essentially a relevance inquiry. *Id*. To be helpful under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry. *Id*. at 433. If polygraph evidence satisfies the requirements of Rule 702, other evidentiary rules may still operate to exclude the evidence. *Id*. In a *Daubert* analysis context, Rule 403 may play an enhanced role, particularly when the scientific or technical knowledge proffered is novel or controversial. *Id.* at 435.

The defendant presented four expert witnesses who testified that polygraph science is sufficiently reliable to be admissible and that the two polygraph examinations taken by Mr. Moultrie were administered under acceptable conditions. David Raskin testified regarding polygraphy as a science. Cliff Cormany performed Moultrie's first polygraph examination, and testified about the circumstances of the examination and his findings. Richard Kiefer performed Moultrie's second polygraph examination and testified similarly. Al Spiers performed quality control reviews of the examinations administered by Cliff Cormany and Richard Kiefer and gave testimony about the quality of Cormany and Kiefer's work.

Dr. David C. Raskin is an expert in psychophysiology, experimental psychology, quantitative methods, and statistical analysis. On direct examination, Dr. Raskin testified that a polygraph examination tests the autonomically controlled systems of the subject being examined. The autonomic nervous system is the part of the central nervous system that operates independently from a person's conscious will. The polygraph machine measures the autonomic nervous system by gauging physiological changes, such as changes in blood pressure, respiration, pulse, sweat gland activity on the palms of the hands (commonly known as galvanic skin response), and blood flow to the skin.

Dr. Raskin explained that polygraphs work as detectors of deception based on an understanding of psychophysiology, which is the study of how psychological processes interact with physiological processes. The most commonly used polygraph test technique is the comparison question technique, which was utilized in both of Moultrie's examinations. The comparison question technique requires the examiner to first conduct a pretest interview with the subject. The examiner gets basic biographical information, explains the examination process, identifies the issues that are to be resolved by the examination, and has the subject detail his or her position on the issues to be resolved.

After the pretest interview, the examiner attaches the subject to the polygraph machine and explains how the machine measures physiological responses. He next performs a demonstration test so the subject can observe the machine at work. The examiner then begins the examination, asking a series of relevant questions and comparison questions. Relevant questions directly relate to the issue the examination seeks to prove or disprove. Comparison questions are questions that are not directly related to the disputed issue, but are designed to be superficially related to the disputed issue. For example, if a person is accused of shooting someone on a particular time and date, a comparison question would refer generally to any acts of violence prior to the time and date of the alleged shooting. Dr. Raskin testified that guilty subjects generally are more concerned about the relevant question and less concerned about the comparison question, as compared to innocent subjects, who often have more concern about the comparison question because the comparison question is broader. Theoretically, innocent parties fear failing to disclose any minor indiscretions.

Scientific studies have been performed on the effectiveness of the comparison question

technique through laboratory and field research.  Dr. Raskin testified that, based upon the totality of these studies, the accuracy of polygraph examinations is roughly 90%.  He stated that research on the control question technique had been subjected to extensive peer-reviewed publication.  In reviewing a table from the 2002 Honts survey on the weight to be given to laboratory polygraph studies determining polygraph accuracy, he indicated that the majority of members both of the American Psychology and Law Society and the Society for Psychophysiological Research felt that these studies should be given moderate or considerable weight.

Dr. Raskin testified extensively and enthusiastically about tests and studies regarding the accuracy and reliability of polygraph science.  However, on cross examination Dr. Raskin acknowledged that some members of the relevant scientific community find polygraph examinations a less reliable means of determining truth.  In 1983, Dr. Raskin participated in the Office of Technology Assessment's study entitled *Scientific Validity of Polygraph Testing: A Research Review and Evaluation*.  After a review of the applicable polygraph studies, including some of Dr. Raskin's studies, that report concluded:

> Overall the cumulative research evidence suggests that when used in criminal investigations, the polygraph test detects deception better than chance, but with error rates that could be considered significant.

*Scientific Validity of Polygraph Testing: A Research Review and Evaluation*, Ch. 1 at *3 (Office of Technology Assessment, November 1983).

More recently, in 2003, the National Academy of Sciences conducted a review of fifty-seven studies about polygraphs.  This fifty-seven study review is the largest review on studies about the accuracy of polygraph evidence to date.  The National Academy of Sciences is a private, non-profit, self-perpetuating society of scholars engaged in scientific research dedicated

5

to the use and furtherance of science and technology and was chartered in 1863 to advise the federal government on scientific and technical matters. The 2003 study, entitled *The Polygraph and Lie Detection*, noted that polygraphic laboratory studies suffer from a lack of realism and tend to overestimate accuracy while field studies have problems identifying the truth against which the test results should be judged. It concluded that "specific incident polygraph tests can discriminate lying from truth telling at rates well above chance, though well below perfection." *The Polygraph and Lie Detection*, 4 (National Academy of Sciences - National Research Council, Committee to Review the Scientific Evidence on the Polygraph 2003). The report found that "accuracy may be highly variable across situations" and that the "evidence does not allow any precise quantitative estimate of polygraph accuracy across personality types, sociodemographic groups, psychological and medical conditions, examiner and examinee expectancies, or ways of administering the test and selecting questions." *Id.* at 214. The study did note, however, that polygraph examinations may have utility, though utility is separate from validity. The study acknowledged that the use of polygraph examinations "can elicit admissions and confessions, deter undesired activity, and instill public confidence."

      This court has thoroughly considered all of the testimony and scientific evidence presented by Moultrie. However, the court finds more persuasive the study performed by the National Academy of Sciences. This study is the most comprehensive study on the subject and the scholars involved actually reviewed some of the very studies discussed by Dr. Raskin during his direct examination. Notably, the Academy's 2003 conclusion that polygraphs work at a rate above chance, but below perfection has not moved far from the Office of Technology Assessment's conclusion twenty years earlier that polygraph examinations work better than

chance, but with a rate of significant error. The court finds that the defendant has not established that the science behind polygraph examinations is sufficiently reliable to be deemed admissible. Accordingly, Moultrie's motion to admit the results of his polygraph examinations must be DENIED.

This court has not found that the defendant has proven that the science behind polygraph examinations have enough evidentiary reliability to be helpful, relevant, or admissible. Further, this court has grave concerns about admitting the results of Moultrie's polygraph examinations, even had the court found polygraph science sufficiently reliable. In *U.S. v. Posado*, the court noted factors that could offset the prejudicial effect of the admission of polygraph evidence. 57 F.3d 428, 435-36 (5th Cir. 1995). In *Posado*, the prosecution was contacted before the polygraph tests were conducted and offered the opportunity to participate in the exams. *See id.* In this instance, in both cases, Moultrie failed to notify the government about the polygraph examinations until after the tests were administered. The government was not allowed to participate in forming the questions and could not observe the examination environments. The record reflects that the government was only offered the opportunity to review the results after the fact. Finally, the defendant placed conditions on viewing the first set of results.

Prejudicial effect may be neutralized if both parties have an equal stake in the outcome of the examination. This can be accomplished if each interested party participates, or has the opportunity to participate, in all aspects of the polygraph examination. The lack of government participation precludes this court from finding that the government's mere review of the results diminishes any prejudicial effect that may be caused by admission of the polygraph examinations. Quality control review of the tests would do nothing to negate the circumstances

7

of the examination or prejudice suffered by the government caused by its inability to participate in the examinations. The exam results proffered lack sufficient indicia of trustworthiness to justify admission as evidence in a court of law.

This motion is DENIED.

This the 13th day of May, 2008.

                                                **/s/ MICHAEL P. MILLS**
                                                **CHIEF JUDGE**
                                                **UNITED STATES DISTRICT COURT**
                                                **NORTHERN DISTRICT OF MISSISSIPPI**